**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Andres Reyes,<br><br>Plaintiff,<br><br>v.<br><br>Ramel Colclough, et al.,<br><br>Defendants. | No. CV 19-00324-PHX-DWL (ESW)<br><br>**ORDER** |

Plaintiff Andres Reyes, who is currently in the custody of the Maricopa County Sheriff's Office, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1.) Defendants move for summary judgment and Plaintiff opposes.[1] (Docs. 56, 65.)

**I.     Background**

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Fourth Amendment excessive force claims against Phoenix Police Officers Colclough and Howard. (Doc. 5.) The Court dismissed the remaining claims and defendants. (*Id.*)

**II.    Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response. (Doc. 59.)

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, *i.e.,* a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, *i.e.,* the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Facts**[2]

On March 7, 2018, sometime before 10:00 a.m., Plaintiff drove to his mother's home in Phoenix, Arizona. (Doc. 57 ¶ 1; Doc. 66 ¶ 1.) Plaintiff was driving a Chevrolet Tahoe that he knew to be stolen. (Doc. 57 ¶ 2; Doc. 66 ¶ 2.) Plaintiff also knew there was a warrant out for his arrest because he had violated the terms of his parole. (Doc. 57 ¶ 3.)

---

[2]    Defendants move to strike several of Plaintiff's controverting facts. (Doc. 73.) The Court will deny the motion to strike but will consider Defendants' objections when setting forth Plaintiff's facts. Moreover, despite the Court's *Rand* warning, Plaintiff did not respond to many of Defendants' asserted facts, which are therefore presumed true.

When Plaintiff arrived at his mother's house, he smoked methamphetamine. (Doc. 57 ¶ 4; Doc. 66 ¶ 3.) Plaintiff had also taken five Xanax and smoked marijuana the night before. (Doc. 57 ¶ 5; Doc. 66 ¶ 3.)

The Fugitive Apprehension and Investigative Detail ("FAID") of the Phoenix Police Department was searching for Plaintiff and had obtained information that he might be at his mother's house. (Doc. 57 ¶ 7.) FAID officers were staged near the house to execute a felony arrest warrant. (*Id.* ¶ 8.) City of Phoenix Police Sergeant Curtis Howard, who on that date was a K-9 Officer, responded to FAID's request for a K-9 officer and took up a position along a frontage road of the I-17 freeway. (*Id.* ¶ 9.) Officer Howard was driving a fully marked Phoenix Police SUV and wearing a full police uniform. (*Id.* ¶ 10.) Officer Howard's K-9 partner on that date was a Belgian Malinois named "Bane." (*Id.* ¶ 11.)

At approximately 10:00 a.m., Plaintiff left his mother's house, got in the stolen Chevrolet Tahoe, and drove away. (*Id.* ¶ 12.) Plaintiff had a loaded AK-47 assault rifle with him in the Tahoe. (Doc. 57 ¶ 13; Doc. 66 ¶ 7.) Plaintiff was a prohibited possessor of firearms, as he had previously been convicted of the crimes of possession of marijuana, theft of means of transportation, conducting a chop shop, possession or use of narcotic drugs, and misconduct involving weapons. (Doc. 57 ¶ 14.)

As Plaintiff left his mother's house, he observed a white van, pointed the AK-47 assault rifle at it, and said, "What the fuck are you doing here motherfucker?" (Doc. 57 ¶ 15.) Although Plaintiff admits that he pointed the AK-47 at the white van and said "What the fuck are you doing here motherfucker?," he claims that "after yelling, [he] noticed no one was inside." (Doc. 66 ¶¶ 5-9.) In any event, it is undisputed that Officer Wilson then broadcast over the police radio that Plaintiff had pointed an AK-47 assault rifle at him. (Doc. 57 ¶ 18.)

Officers assigned to the Phoenix Police Department Special Assignments Unit ("SAU"), who were in unmarked vehicles, conducted tactical surveillance of the vehicle driven by Plaintiff. (*Id.* ¶ 19.) The Air Unit also participated in the tactical surveillance, initially using a police helicopter. (*Id.* ¶ 20.) Plaintiff began speeding and was driving

erratically. (Doc. 57 ¶ 21; Doc. 66 ¶ 10.) Plaintiff entered the access road to the I-17 freeway and saw what he correctly believed was a police helicopter overhead. (Doc. 57 ¶ 21; Doc. 66 ¶ 10.) Plaintiff made turns onto several streets until he reached the area of 21st Avenue and Van Buren Street. (Doc. 57 ¶ 22; Doc. 66 ¶ 11.) Defendants contend that while Plaintiff was driving westbound on Van Buren Street from 21st Avenue, he pointed the AK-47 assault rifle into the air through the vehicle's sun roof and fired approximately ten times; Plaintiff denies this happened when he was driving the Tahoe but admits he did this when he was driving the Buick he later stole. (Doc. 57 ¶ 23; Doc. 66 ¶¶ 12-13, 16, 55.) Plaintiff also admitted during his deposition that he knew at the time he fired the weapon that he could have harmed or killed someone. (Doc. 57 ¶ 25.)

Plaintiff continued driving westbound on Van Buren Street until he crashed the Tahoe into a traffic pole, disabling the vehicle. (Doc. 57 ¶ 26.) Plaintiff then exited the Tahoe with the AK-47 assault rifle in hand and approached a black Buick SUV that was stopped at the intersection. (Doc. 57 ¶ 27; Doc. 66 ¶¶ 14-15.) Defendants contend that Plaintiff pointed the assault rifle at the driver of the Buick SUV, indicating for him to get out of the vehicle, and the driver exited the vehicle; Plaintiff admits that he was holding the AK-47 at the time but denies that he pointed it at the victim. (Doc. 57 ¶ 28; Doc. 66 ¶ 15.) Plaintiff got in the Buick SUV and drove away. (Doc. 57 ¶ 28.)

Plaintiff drove the black Buick SUV westbound on Van Buren. (Doc. 57 ¶ 29.) Plaintiff admits that as he was driving, he was intentionally fleeing the police. (*Id.* ¶ 30.) Plaintiff further admits he disobeyed numerous traffic control devices, drove erratically, and was speeding through neighborhoods, thereby creating a danger to the people in those neighborhoods. (*Id.* ¶ 31.) Plaintiff claims that at some point while driving the Buick SUV he blacked out, after which he found himself driving in the area of 48th Avenue and Thomas. (Doc. 57 ¶ 32; Doc. 66 ¶ 17.)

The Air Unit of the Phoenix Police Department continued its tactical surveillance of Plaintiff, this time in a fixed wing aircraft. (Doc. 57 ¶ 33.) The Air Unit video recorded

Plaintiff's movement as he continued to drive erratically.³ (*Id.* ¶ 34.) The Air Unit also broadcast Plaintiff's location over the police radio. (*Id.* ¶ 35.) Plaintiff claims he blacked out a second time and when he "woke up" he was on the I-10 freeway. (Doc. 57 ¶ 36; Doc. 66 ¶ 19.) Plaintiff then exited the freeway and blacked out again, regaining consciousness when he was at 33rd Avenue and Van Buren Street. (Doc. 57 ¶ 37; Doc. 66 ¶ 20.) Plaintiff admitted during his deposition that he likely does not remember some parts of his driving because he was high on drugs. (Doc. 57 ¶ 38.)

Plaintiff continued making turns until he was driving northbound on 33rd Avenue and he saw a police Tahoe and an armored vehicle. (*Id.* ¶ 39.) Officer Howard was monitoring the tactical surveillance on the police radio when he heard that Plaintiff was heading toward his location, so he pulled over and parked his marked vehicle facing southbound on 33rd Avenue near Jefferson Street. (*Id.* ¶ 40.) Plaintiff then passed Officer Howard driving northbound. (*Id.* ¶ 41.) Defendant City of Phoenix Police Sergeant Ramal Colclough, who at that time was an SAU Officer, had been attending training at the Phoenix police academy when he was advised that SAU officers were needed to respond to a carjacking in the Maryvale area of Phoenix. (*Id.* ¶ 42.)

Officer Colclough was advised that the suspect, a Hispanic male, was driving a stolen Black crossover sedan that he had carjacked at gun point, was armed with an AK-47 assault rifle, and had pointed the AK-47 at an undercover officer. (*Id.* ¶ 43.) Officer Colclough also learned that the suspect had fired several rounds into the air in the Maryvale area using the AK-47. (*Id.*) Officer Colclough left the police academy driving an unmarked Chevrolet utility truck and traveled to the area where the Air Unit advised the suspect was located. (*Id.* ¶ 45.)

Officer Colclough first observed the vehicle driven by Plaintiff in the area of 33rd Avenue and Jefferson Street traveling northbound on 33rd Avenue. (*Id.* ¶ 46.) Officer Colclough was traveling southbound behind an armored vehicle ("Bear") driven by another Phoenix police officer. (*Id.* ¶ 47.) Officer Colclough saw the Bear attempt a PIT maneuver.

---

³ Defendants produced video of this air surveillance. (Doc. 61.)

1     (*Id.* ¶ 48.) A PIT maneuver is a pursuit tactic by which a pursuing car can force a fleeing car to turn sideways abruptly, causing the driver to lose control and stop. (*Id.* ¶ 49.) Plaintiff veered to the right (toward the sidewalk) in an unsuccessful attempt to avoid colliding with the Bear. (Doc. 57 ¶ 50; Doc. 66 ¶¶ 22-24.) Despite this contact, the Bear was unsuccessful in stopping Plaintiff's vehicle. (Doc. 57 ¶ 51; Doc. 66 ¶ 26.)

    Officer Howard, who saw the Bear make contact with Plaintiff's vehicle, made a U-turn, headed north on 33rd Avenue, and positioned his police vehicle behind the Bear. (Doc. 57 ¶ 52.) After Plaintiff collided with the Bear, his vehicle was facing Officer Colclough's utility truck. (*Id.* ¶ 53.)

    Based on Officer Colclough's observations and the information he had received, he believed that Plaintiff was armed and dangerous and that Plaintiff presented an imminent deadly threat to his life, the lives of the other police officers in the area, and civilians in the area. (*Id.* ¶ 54.) As a result, Officer Colclough believed he needed to stop the vehicle Plaintiff was driving immediately, using any means necessary. (*Id.*) Officer Colclough drove the utility truck toward Plaintiff's vehicle, traveling at a speed of approximately 35-40 miles per hour, and he collided head on with Plaintiff's vehicle, causing the air bags in both vehicles to deploy. (Doc. 57 ¶ 55; Doc. 66 ¶ 27.)

    After the air bags deployed, Plaintiff threw his arms in the air. (Doc. 57 ¶ 58; Doc. 66 ¶ 28.) Although Plaintiff asserts in his declaration that he did so "to let officers know that [he] was peacefully surrendering, that [he] was no longer fleeing or posed a threat" (Doc. 66 ¶¶ 28, 62), Plaintiff acknowledged during his deposition that he "posed a danger at the time of this collision both to the police officers who were present and anybody who was in the neighborhood where the crash occurred." (Doc. 57-1 at 53; Doc. 57 ¶ 60.) Plaintiff also admitted during his deposition that, during the post-collision sequence, his AK-47 assault rifle was inside the vehicle next to him and that the barrel of the rifle was pointed toward the dashboard. (Doc. 57-1 at 35-36; Doc. 57 ¶ 59.)

    Just after the collision, Officer Colclough believed he observed a large, black object

in Plaintiff's right hand, which Plaintiff appeared to be lifting. (Doc. 57 ¶ 61.)[4] Officer Colclough believed this object was a rifle. (*Id.*) Thus, it was Officer Colclough's belief that Plaintiff continued to pose an imminent threat of serious injury or death to officers and civilians in the area. (*Id.*) This object was located toward the right of the driver's compartment, in between the driver's compartment and the passenger seat, toward the center of the vehicle. (*Id.* ¶ 62.) Officer Colclough could not see how far Plaintiff had shifted from the driver's side of the vehicle. (*Id.* ¶ 63.) Officer Colclough knew Plaintiff had pointed the rifle at an undercover officer, had fired the rifle at several locations throughout the city, and had used the rifle to carjack an individual. (*Id.* ¶ 64.) Officer Colclough also knew that Plaintiff was a convicted felon with a warrant out for his arrest. (*Id.* ¶ 65.) Officer Colclough believed he had a split-second advantage to stop the deadly threat posed by Plaintiff, who was armed with an AK-47 assault rifle that he believed Plaintiff intended to use against officers and/or civilians in the area, and Officer Colclough made the decision to use deadly force against Plaintiff to prevent Plaintiff from shooting him, other officers, and civilians in the area. (*Id.* ¶ 67.)

Officer Colclough removed his rifle from the passenger seat floorboard and fired approximately six rounds while he was still inside the utility truck. (*Id.* ¶ 68.) The rounds pierced his windshield and then went through the windshield of the black Buick SUV being operated by Plaintiff. (*Id.*) Officer Colclough aimed toward the driver's seat compartment area where he suspected Plaintiff was positioned. (*Id.* ¶ 69.) Plaintiff acknowledges that Officer Colclough began firing "2 to 3 seconds" after the collision. (Doc. 66 ¶ 28.)

When Officer Howard arrived at the scene, he heard over the police radio that there had been an officer-involved shooting. (Doc. 57 ¶ 70.) After Officer Colclough fired his rifle, the officer driving the Bear drove it toward the rear of Plaintiff's vehicle to prevent the Buick from backing up. (*Id.* ¶ 71.) The officer driving another armed vehicle (a

---

[4] In his controverting statement of facts, Plaintiff accuses Officer Colclough of "lying" about seeing a black object in Plaintiff's hand in the immediate aftermath of the collision and claims to possess evidence to prove that Officer Colclough is lying. (Doc. 66 ¶ 57.) However, Plaintiff does not submit this alleged evidence.

Bearcat) drove toward the driver's side of Plaintiff's vehicle and pinned in Plaintiff's vehicle. (*Id.* ¶ 72.) Other SAU officers were positioned on the driver's side of Plaintiff's vehicle. (*Id.* ¶ 73.)

Plaintiff was hit in the head with bullets or bullet fragments. (Doc. 57 ¶ 74; Doc. 66 ¶ 32.) Plaintiff claims he went unconscious after the bullets were shot at him and he woke up with his body leaning to the right toward the passenger side of the vehicle with his hands low and out of view of any officers. (Doc 57 ¶ 75; Doc. 66 ¶ 33.)

Officer Howard initially took up a position (with his K-9 partner Bane) on the driver's side of Plaintiff's vehicle behind the Bearcat. (Doc. 57 ¶ 77.) Officer Howard heard other officers giving commands to Plaintiff to exit the vehicle, but Plaintiff did not comply. (*Id.* ¶ 78.) Plaintiff admits he blacked out for a period of time after the collision with the utility truck and therefore might not have been complying with commands being given by the police. (*Id.* ¶ 79.) Officer Colclough could no longer see Plaintiff's weapon, and he advised the other officers on the scene to leave the driver's side of Plaintiff's vehicle and approach the passenger side to try to extract Plaintiff from the vehicle. (*Id.* ¶ 80.)

Officer Howard then received a radio transmission indicating that the other officers at the scene did not have a visual of Plaintiff. (*Id.* ¶ 81.) The driver of the Bear moved it from behind the Buick to the passenger side of the Buick and Officer Howard moved to position himself at the passenger side of the Bear. (*Id.* ¶ 82.) Plaintiff eventually gained consciousness and heard officers ordering him to show his hands, so he raised both hands and put them against the driver's side window. (*Id.* ¶ 83.)

Officer Howard and Officer Colclough saw Plaintiff press his hands against the glass on the passenger side window, underneath the airbag curtain, but then Plaintiff dropped at least one of his hands out of the officers' view. (Doc. 57 ¶ 84; Doc. 66 ¶ 40 [Plaintiff's admission that he lowered his right hand "out of their view in order to reach the door handle"].) Another officer deployed several Arwen gas and non-gas impact rounds at the Buick's passenger side windows in an attempt to break them. (*Id.* ¶ 85.) Arwen rounds are non-lethal impact rounds fired from a rifle/launcher. (*Id.* ¶ 86.) The initial

rounds did not break the window and instead bounced off or simply made a hole. (*Id.* ¶ 87.) The last round broke the window. (*Id.*) After the last round was fired, Plaintiff opened the passenger door of the Buick but did not exit and instead remained laying across the passenger seat of the Buick. (*Id.* ¶ 88.)

Plaintiff admits that he was laying on top of the AK-47 and had the ability to use it to shoot. (Doc. 57 ¶ 89; Doc. 66 ¶ 35-38.) Plaintiff claims that he followed commands of officers who were on the passenger side of the Buick, by opening the door of the vehicle and sticking his hands out. (Doc. 57 ¶ 90; Doc. 66 ¶¶ 39-42.) The officers gave Plaintiff commands to push himself out of the vehicle with his legs. (Doc. 57 ¶ 91.) Plaintiff claims that as he was pushing himself out, his pants and boxers got stuck on the Buick's gearshift, and he claims he told the officers he was stuck. (Doc. 57 ¶ 92; Doc. 66 ¶¶ 43-44.) Plaintiff admits it would have been reasonable for the officers to disbelieve him when he said he was stuck. (Doc. 57 ¶ 93.)

When Plaintiff did not obey the commands to push himself out of the Buick, Officer Howard believed that Plaintiff was deliberately choosing to disobey the officers' commands. (*Id.* ¶ 94.) Additionally, Officer Howard knew that Plaintiff was in possession of and had access to an AK-47 assault rifle, had recently pointed it at two different people, and had fired it into the air while driving. (*Id.* ¶ 95.) As a result, Officer Howard had significant concerns that Plaintiff would seriously injure or kill officers and/or civilians in the area and knew that Plaintiff needed to be taken into custody quickly. (*Id.*).

Officers continued to give Plaintiff commands to exit the vehicle. (*Id.* ¶ 98.) When Plaintiff did not exit the vehicle in compliance with those commands, Officer Howard decided to deploy his K-9 Bane to extract Plaintiff. (*Id.* ¶ 99.) Officer Howard made this decision because he believed it was unsafe for officers to approach the vehicle in an attempt to extract Plaintiff. (*Id.* ¶ 99.) Officer Howard typically did not warn an armed suspect that a K-9 was going to approach because such a warning would give the suspect time to use his weapon and thus place the K-9, the K-9 officer, and other officers in danger. (*Id.* ¶ 113.)

Officer Howard directed Bane to apprehend Plaintiff. (*Id.* ¶ 100.) Initially, Bane grabbed Plaintiff's hoodie sweatshirt and pulled it off Plaintiff. (Doc. 57 ¶ 101; Doc. 66 ¶ 45.) K-9 Officer Howard then commanded Bane to reengage. (Doc. 57 ¶ 102.) Bane bit Plaintiff's left forearm. (Doc. 57 ¶ 103; Doc. 66 ¶ 46.) When Officer Howard tried to pull Bane out by his leash, Bane lost his grip of Plaintiff. (Doc. 57 ¶ 104.) Officer Howard increased the slack on the leash in order to allow Bane to reattach. (*Id.* ¶ 105.) Bane did so and Bane and Officer Howard pulled Plaintiff out of the vehicle. (Doc. 57 ¶ 106; Doc. 66 ¶¶ 48-49.)

Once Plaintiff had been pulled to the side of the Bear where Officer Howard was positioned and SAU officers took control of Plaintiff's arms, Officer Howard had Bane disengage. (Doc. 57 ¶ 108.) SAU Officers then placed handcuffs on Plaintiff's wrists. (*Id.* ¶ 109.) After Plaintiff was placed in handcuffs, Officer Howard observed the barrel of a rifle on the front passenger seat of the Buick, partially covered by Plaintiff's pants. (*Id.* ¶ 112.)

Plaintiff was transported to the hospital. (*Id.* ¶ 117.) There, he was treated for gunshot wound fragments to the left lower knee and right scalp and a left arm laceration caused by the K-9. (*Id.* ¶ 118.) Following his arrest, Plaintiff was charged with armed robbery, aggravated assault, unlawful use of means of transportation, kidnapping, burglary, discharge of a firearm in city limits, and prohibited possession of a weapon. (*Id.* ¶ 120.)

**IV. Discussion**

Defendants assert they are entitled to qualified immunity on Plaintiff's excessive force claims because their use of force was reasonable and they did not violate Plaintiff's clearly established rights.

**A.    Qualified Immunity—Excessive Force**

"When an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right. If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-

trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted). Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). *See also Orn*, 949 F.3d at 1174 ("We have the discretion to skip the first step in certain circumstances, as when the officer is plainly entitled to prevail at the second step.").

In § 1983 actions involving claims of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances." *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014). The reasonableness of the use of force "must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). When determining whether the totality of the circumstances justifies the degree of force, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). "Because this inquiry is inherently fact specific, the determination of whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green*, 751 F.3d at 1049 (quotation omitted).

As for the second step's "clearly established" inquiry, although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)

(citation omitted). In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted). "[T]he plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted).[5]

### B. Officer Colclough

#### 1. Objectively Reasonable Use of Force

The first step in evaluating Officer Colclough's claim of qualified immunity is determining whether the force he used was objectively reasonable, taking into account the severity of the crime at issue, whether Plaintiff posed an immediate threat to the safety of the officers or others, and whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight.

As for the severity of the crime at issue, Officer Colclough reasonably believed that Plaintiff was purposefully fleeing from the police in a stolen car, had pointed his AK-47 at an undercover officer sitting in a white van outside Plaintiff's mother's house, had

---

[5] Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These opinions are difficult to reconcile. *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity issues presented in this appeal. . . . [T]he applicable—and well-settled—rule [in the Ninth Circuit] is that '[t]he plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.'") (citation and emphases omitted).

separately pointed his AK-47 at a motorist when carjacking a vehicle, had driven erratically without regard for the safety of others, and had gratuitously pointed his AK-47 into the air through a vehicle's sun roof and fired approximately ten times.[6]  Plaintiff also had an outstanding felony warrant.  The crimes at issue were severe.

Next, "[t]he most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety."  *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132-33 (9th Cir. 2019).  Here, as an initial matter, Officer Colclough reasonably believed that Plaintiff posed an immediate threat to his safety, and the safety of others, at the time he stopped Plaintiff's vehicle.  Plaintiff had engaged in a wild, danger-filled crime spree in which he fled from police at high speed, carjacked another motorist, repeatedly fired his AK-47 through the sun roof of a stolen vehicle, brandished his AK-47 at yet another vehicle, and kept fleeing even after an armored police vehicle used intervention techniques in an unsuccessful attempt to stop him.  It was only after Officer Colclough purposefully caused a high-speed, head-on collision with Plaintiff's stolen vehicle that Plaintiff finally came to a stop.  *Cf. Scott v. Harris*, 550 U.S. 372, 386 (2007) ("A officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.").

Notwithstanding all of this, Plaintiff argues that because he raised his hands in the immediate aftermath of the collision, any danger had dissipated by the time Officer Colclough chose to fire at him.  This argument is unavailing.  Plaintiff admits that he had the AK-47 next to him in the vehicle, pointed forward—the same weapon Plaintiff had just demonstrated a willingness to use, by, *inter alia*, firing off shots through the sun roof during

---

[6]  Plaintiff's disputes regarding these facts—that he did not know someone was actually sitting in the white van when he threatened the person in it, that he did not actually point the AK-47 at the motorist while stealing the motorist's vehicle, and that he was driving a different car when he gratuitously fired into the air—are not material.  Moreover, Plaintiff also claims to have been on several drugs, questions his own memories of the incidents, and states that certain things "allegedly" happened while simultaneously admitting to them.  In any event, there is no dispute that the Defendants relied on other officers' reports of Plaintiff's actions and believed all of these facts to be true at the time of the incidents.

the police chase—at the time he claims to have raised his hands. Plaintiff also admits that the post-collision sequence occurred in rapid fashion, with Office Colclough firing the shots "2 to 3 seconds" after the collision. Tellingly, Plaintiff acknowledged during his deposition that he posed a danger at the time of the collision to the police officers who were present and anybody who was in the neighborhood where the crash occurred. Thus, regardless of whether Plaintiff actually had the AK-47 in his hand as he was raising his hands (as Officer Colclough believed) or not (as Plaintiff claims), it was objectively reasonable for Officer Colclough to perceive that Plaintiff posed an immediate threat and to respond accordingly. *See, e.g., George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ("This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them. If the person is armed—*or reasonably suspected of being armed*—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.") (emphasis added); *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) ("Where an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact."); *Gwynn v. Sherwood*, 2020 WL 60238, *4 (D. Nev. 2020) ("[E]ven a mistaken belief that a suspect is armed may be reasonable in some circumstances."). The bottom line is that, even accepting Plaintiff's version of the facts, this was a chaotic, fast-moving, dangerous situation that posed an immediate threat of harm to officers and bystanders. *See generally Graham*, 490 U.S. at 397 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

Finally, as for whether Plaintiff actively resisting arrest or attempting to evade arrest by flight, the considerations discussed above show this factor was also present.

Considered together, the *Graham* factors compel the conclusion that the force used by Officer Colclough was objectively reasonable and that no constitutional violation occurred.

### 2. Clearly Established

At a minimum, Officer Colclough is entitled to qualified immunity because the law was not clearly established as of March 2018 that it is objectively unreasonable for a police officer to discharge his firearm under these circumstances. Although Plaintiff cites cases that stand for the generic proposition that an officer cannot shoot "an unarmed, non-dangerous suspect" (Doc. 65 at 15), none of those cases found constitutional violations under facts remotely similar to those present here.[7]

### C. Officer Howard

#### 1. Objectively Reasonable Use of Force

Plaintiff's remaining excessive force claim challenges Officer Howard's decision to deploy a police dog, Bane, against Plaintiff in the aftermath of the collision.

This claim is easily rejected. As for the first *Graham* factor, Officer Howard was, like Officer Colclough, confronting a serious crime.

As for the second (immediate threat to safety) and third (actively resisting arrest) *Graham* factors, Plaintiff just led the police on a wild case that involved gunshots, a carjacking, and multiple attempts to avoid apprehension. Following the collision, Officer Howard heard other officers instructing Plaintiff to exit the vehicle, but Plaintiff did not heed those commands. After officers fired a non-lethal round through the window of Plaintiff's vehicle, Plaintiff finally opened the door, but again he didn't exit. At this point, Plaintiff was laying on top of his AK-47 and admits he had the ability to use it. Finally, when officers instructed Plaintiff to push himself out of the vehicle with his legs, Plaintiff again didn't comply. Although Plaintiff claims he didn't comply because his pants and

---

[7] For example, in *King v. Hill*, 615 Fed. App'x 470 (10th Cir. 2015), the officers were "not . . . investigating a serious crime" and "the officers were informed that . . . there were no known weapons in the house; King was unarmed at the time of shooting; both of his hands were visible; he could not have been holding a long gun; and any threats King made about black powder in the house did not pose any immediate threat to the deputies because of their distance from him and from the house." *Id.* at 475 (internal quotation marks omitted). Meanwhile, in *Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010), the court *granted* qualified immunity to an officer who had discharged his firearm in an attempt to stop a fleeting suspect in a vehicle, emphasizing that "there was a rapidly developing situation and the officers clearly did not have complete control of the events that were unfolding." *Id.* at 669-70.

- 15 -

underwear got stuck on the vehicle's gearshift, he admits it would have been reasonable for the officers to disbelieve him when he said he was stuck.  Under these circumstances, it was objectively reasonable for Officer Howard to conclude that Plaintiff continued to pose an immediate threat to his (and others') safety.  The deployment of Bane was reasonably necessary under the circumstances. *Miller v. Clark Cty.*, 340 F.3d 959, 966 (9th Cir. 2003) (rejecting Fourth Amendment challenge to officer's deployment of police dog, where "the deputies had attempted several less forceful means to arrest Miller, including: signaling to Miller with emergency lights and siren to stop his vehicle; pursuing Miller's vehicle in a police cruiser; pursuing Miller on foot; and audibly warning Miller to surrender or be chased by a police dog," and holding that "[u]nder the circumstances confronting [the K-9 officer], use of the police dog was well suited to the task of safely arresting Miller").

### 2. Clearly Established

At a minimum, Officer Howard is entitled to qualified immunity because the law was not clearly established in March 2018 that it is objectively unreasonable for a police officer to deploy a police dog under these circumstances.  Plaintiff does not cite any police dog cases in his response brief, let alone establish a robust consensus of persuasive authority demonstrating that Officer Howard's conduct was impermissible. *Cf. Scott v. Lazure*, 2020 WL 2615502, *8 (D. Conn. 2020) ("There are no Supreme Court or Second Circuit cases precluding . . . deploying a canine to stop a fleeing suspect who fails to heed a police officer's commands and actively resists arrest.  Indeed, reported cases suggest that [such] a use of force was reasonable.").

…
…
…
…
…
…

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' motion for summary judgment (Doc. 56) and Defendants' motion to strike (Doc. 73).

(2) Defendants' motion to strike (Doc. 73) is **denied**.

(3) Defendants' motion for summary judgment (Doc. 56) is **granted** and this action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 7th day of December, 2020.

Dominic W. Lanza
United States District Judge